## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SHAWN R.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:23-CV-3438-MAB[2] |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Shawn R. is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. For the reasons set forth below, the Commissioner's decision is REVERSED and this matter is REMANDED for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. § 405(g).

### PROCEDURAL HISTORY

Plaintiff protectively filed an application for SSI on November 6, 2021, alleging a disability onset date of April 26, 2021 (Tr. 17). Plaintiff's claim was initially denied on July 26, 2022, and again on October 3, 2022, following his request for reconsideration (Tr. 17,

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c) (Doc. 10).

73, 84). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred by telephone on May 31, 2023 (Tr. 17 & 35-64). Following the hearing, ALJ Matthias Onderak issued an unfavorable decision on June 29, 2023 (Tr. 17-30). Plaintiff timely filed a request for review, but that request was denied by the Appeals Council (Tr. 1-3). Accordingly, the ALJ's decision became the final agency decision and Plaintiff exhausted his administrative remedies (Tr. 1).

Plaintiff filed his Complaint with this Court on October 19, 2023 (Doc. 1). Thereafter, the Commissioner submitted a Transcript of the Administrative Record on December 7, 2023 (Doc. 11). Plaintiff's social security brief was filed on January 8, 2024 (Doc. 13), and the Commissioner's social security brief was filed on March 27, 2024 (Doc. 19). Plaintiff then filed a reply brief on April 20, 2024 (Doc. 20).

## APPLICABLE LEGAL STANDARDS

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).[3]

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.

To determine whether a claimant is disabled, the ALJ conducts a five-step sequential analysis. 20 C.F.R. § 416.920(a)(4). The first step is to determine whether the claimant is presently engaged in substantial gainful activity. *Id.* at § 416.920(a)(4)(i). If the answer is yes, then the claimant is not disabled regardless of their medical condition, age, education, and work experience. *Id.* at § 416.920(a)(4)(i), (b). If the answer is no and the individual is not engaged in substantial gainful activity, the analysis proceeds to the second step. *Id.* at § 416.920(a)(4).

At step two, the ALJ considers whether the claimant has a medically determinable physical or mental impairment, or a combination of impairments, that is "severe" and expected to persist for at least twelve months. 20 C.F.R. § 416.920(a)(4)(ii), 416.909. If the answer is no, then the claimant is not disabled. *Id.* at § 416.920(c). If the answer is yes, the analysis proceeds to step three. *Id.* at § 416.920(a)(4).

At step three, the ALJ must determine whether the claimant's severe impairments, singly or in combination, meet the requirements of any of the "listed impairments" enumerated in the regulations. 20 C.F.R. § 416.920(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (list of impairments). A claimant who meets the requirements of a "listed impairment" is deemed disabled. 20 C.F.R. § 416.920(d). For claimants who do not meet the requirements of a "listed impairment," the ALJ must then determine the claimant's residual functional capacity ("RFC"). *Id.* at § 416.920(e).

An individual's RFC is his or her ability do work despite the individual's impairments. *Id.* at § 416.945; *see also Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) ("RFC is the maximum that a claimant can still do despite his mental and physical

limitations."). "In assessing a claimant's RFC, the ALJ must consider all of the relevant evidence in the record and provide a 'narrative discussion' that cites to specific evidence and describes how that evidence supports the assessment. The ALJ's analysis and discussion should be thorough and '[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.'" *Passig v. Colvin*, 224 F. Supp. 3d 672, 680 (S.D. Ill. 2016) (quoting SSR 96-8).

At step four, the ALJ must determine whether the claimant retains the RFC to perform the requirements of their past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). If the answer is yes, then the claimant is not disabled. *Id.* at § 416.920(a)(4)(iv), (f). If the answer is no, the analysis proceeds to the final step. *Id.* at § 416.920(a)(4).

At the fifth and final step, the ALJ must consider whether the claimant can make an adjustment to perform any other work considering the claimant's RFC, age, education, and work experience. *Id.* at § 416.920(a)(4)(v). If the claimant can make an adjustment to other work, then the claimant is not disabled. *Id.* at § 416.920(g). Conversely, if the claimant cannot, then the claimant is disabled. *Id.*

Notably, the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). This Court's task is not to determine whether Plaintiff was, in fact, disabled at the relevant time, but instead to determine whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). "[W]e cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Id.* (internal citations omitted).

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is presented in mostly chronological order and directed to the points and factual allegations raised by Plaintiff. Specifically, because Plaintiff challenges the ALJ's determination regarding his RFC and ability to perform other work in the national economy (*see* Doc. 13 at pp. 8-14), the Court's summary of the record focuses upon evidence pertaining to those issues.

I.     _Relevant Medical Records_:

Plaintiff alleges his disability began on April 26, 2021 (Tr. 17). Plaintiff's medical
records from an October 2021 telephone appointment with Dr. Aaron Newcomb reflect
that Plaintiff was in remission for opioid dependence and was also suffering from
Generalized Anxiety Disorder and Major Depressive Disorder (Tr. 338-44). Records from
Licensed Clinical Professional Counselor (LCPC) Alexandria Markel from that same
month contained similar findings and also discussed Plaintiff's suicidal ideations (Tr.
330-36). Plaintiff reported that his anxiety and panic attacks were typically triggered by
the police, social situations, and thoughts about his health, which then caused difficulty
concentrating, excessive worrying/anxiety, fatigue, sleep disturbances, and muscle
tension (Tr. 333). Likewise, Plaintiff reported that his depression was likely triggered by
his anxiety and life issues, and that his depression resulted in difficulty concentrating,
fatigue, irritability, restlessness, feelings of hopelessness, withdrawal from his usual
activities, and suicidal ideations (Tr. 333). Plaintiff stated that he attempted to die by
suicide seven times, with three "serious" attempts (Tr. 333-35). However, he did not want
to die at that time because he did not want to do that to his mother or sister (Tr. 333-35).
Plaintiff also said he had a second job interview the following week and was looking
forward to reentering the workforce (Tr. 335).

At a November 2021 follow-up appointment, Dr. Newcomb found that Plaintiff's
baseline symptoms for anxiety and depression had considerably improved, and Plaintiff
reported no insomnia (Tr. 321-326). Dr. Newcomb also observed that Plaintiff
demonstrated good judgment, appeared well-oriented, exhibited a normal mood, and

had a normal recent and remote memory (Tr. 327). However, at a January 2022 follow-up appointment, Plaintiff reported that he had relapsed once on amphetamines and winter was very hard on him (Tr. 308). Plaintiff had another follow-up appointment with Dr. Newcomb in February 2022 (Tr. 284). At that time, he reported that he was doing pretty good and was staying clean but did not do much other than sit at home (Tr. 289). However, Plaintiff also reported that while not employed, he was working from home on an eBay business and doing odd jobs (Tr. 287).

Plaintiff had a telephone appointment with Nurse Linda Dodd on May 3, 2022 (Tr. 368). At that appointment, Plaintiff reported that he cleaned his house, bought a tiller, and planned to mow his yard and make a garden (Tr. 371). Just a few days later, Plaintiff had an appointment with James Sparks (Tr. 362). During that appointment, Mr. Sparks found that Plaintiff had improved and was oriented, upbeat, confident, and in good spirits (Tr. 366). In addition, Plaintiff mentioned several future plans of his, including attempting to get his license back, looking into becoming a truck driver, and one day opening up a community-based help center (Tr. 366). Plaintiff said that he had no suicidal ideations over the past week, but he had trouble sleeping and would wake up with panic attacks (Tr. 366). Plaintiff also discussed how he was told by his former wife that he quits breathing while sleeping, which concerns him (Tr. 366). At a subsequent check-in with Mr. Sparks on May 16, 2022, Plaintiff reported that he had made progress with some activities such as making a vet appointment to have his cat spaded (Tr. 354). However, his suicidal ideations were occurring on a daily basis again – although Plaintiff reiterated that he did not want to die by suicide until after his mom had passed away (Tr. 354).

On June 1, 2022, Plaintiff experienced a mental health setback, believed by Plaintiff to be due to personal issues, and was admitted to the Mulberry Center (Tr. 423). At that time, Plaintiff reported worsening depression and suicidal ideations, and a drug screening tested positive for THC and benzodiazepine (Tr. 423-436). Daily progress notes from Dr. Lee Tung Jen Weng noted Plaintiff had been on Valium for roughly one week, and was upset at its discontinuation (Tr. 439-43). Plaintiff informed Dr. Weng that after his discharge, he planned to move a camper to his mother's house and live on her property, obtain disability payments, and get his CDL license (Tr. 445). Medical records from his time at Mulberry indicate that Plaintiff was diagnosed with schizoaffective disorder-depressed, generalized anxiety disorder, THC use disorder, and opiate use disorder in long term remission on suboxone (Tr. 455). A discharge summary from June 9, 2022, observed that Plaintiff "showed some improvement in mood during hospitalization," was future oriented, and attended programming and interacted well with staff and patients (Tr. 461).

Plaintiff was seen by Dr. Fred Klug, a licensed clinical psychologist, on June 16, 2022 (Tr. 518). Plaintiff informed Dr. Klug that he is unable to work because he has trouble dealing with life, doesn't leave his house, and has a lot of fears (Tr. 518). Dr. Klug observed that Plaintiff appeared alert, oriented, cooperative, and his dress, hygiene, and grooming were casual but clean (Tr. 519). Plaintiff exhibited an adequate attention span, did his serial 3's slowly but without errors through ten calculations, and correctly spelled the word "truck" backwards (Tr. 519). Furthermore, his long-term memory was intact, he had an adequate fund of knowledge, demonstrated good reasoning, had good judgment,

and exhibited fair insight (Tr. 519-20). However, Dr. Klug found that Plaintiff's short-term memory was impaired, his ability to do simple calculations was poor, and his abstract thinking was also poor (Tr. 519). Dr. Klug also noted that Plaintiff's predominant mood was dysphoric and nervous (Tr. 522). Dr. Klug stated that Plaintiff did not experience obsessions or compulsions, but frequently worried about things such as money and his mental health (Tr. 521). Finally, Dr. Klug concluded that Plaintiff could not participate in the management of his own funds (Tr. 522).

Plaintiff visited with Dr. Newcomb on several occasions in 2022 following his visit with Dr. Klug (Tr. 530, 538, 546, 554). On June 20, 2022, Plaintiff told Dr. Newcomb that he was in Mulberry for a week, and it definitely helped him (Tr. 559). He also indicated that he had moved back in with his mom and decreased his use of valium (Tr. 559). Over the next few months, Plaintiff's medical reports from his appointments with Dr. Newcomb generally observed that his baseline anxiety and depression symptoms had improved (Tr. 535-36, 543-44, 551-52, 559-60). However, it was also reported that Plaintiff was suffering from panic attacks after abruptly stopping lorazepam (Tr. 535-36, 543).

At a December 13, 2022, appointment with Dr. Newcomb, Plaintiff reported that valium was the most effective drug he was taking, and he had been supplementing it off the streets (Tr. 1243). He stated that when he takes valium, he is able to get through the day without having any thoughts about suicide (Tr. 1243). When questioned about the results of his last drug test, Plaintiff admitted to having done a line of meth prior to attending that appointment (Tr. 1243). On that same date, Dr. Newcomb also completed the medical provider portion of a report related to Plaintiff's ability to drive, wherein Dr.

Newcomb marked that he believed Plaintiff was medically and mentally fit to safely operate a motor vehicle (Tr. 1304).

At a January 24, 2023, appointment with Dr. Newcomb, Plaintiff reported that his medications were helping and he had been working on his house (Tr. 1227). At that same appointment, however, Plaintiff also admitted to having had a weak moment and doing "a line" (Tr. 1227). In March 2023, Plaintiff reported that he had briefly worked at a job repairing cars, but it did not pay well and ultimately "went south" because the boss frequently blamed him and didn't know what he was talking about (Tr. 1211).

At an appointment with Dr. Newcomb on April 24, 2023, Plaintiff complained of joint pain he believed was caused by the various work he was doing for others, including working on roofs, climbing trees, working for his mother, sewer lining, installing siding, and working on numerous lawn mowers and weed eaters (Tr. 1201). Plaintiff stated that his sister had recently passed away and admitted to slipping up with meth (Tr. 1201). He also said diazepam was helping him a lot, and he was doing better with his family and even helping potty train his nephew (Tr. 1201). Additionally, Plaintiff stated that he had a vehicle, so he was doing a lot better (Tr. 1201).

II.    _Disability Determinations & Agency Reports_:

Several state agency consultants provided their opinions after reviewing the evidence.[4] At the initial level, Donna Galassi-Hudspeth, Psy.D, opined that Plaintiff's

---

[4] Additionally, as discussed in the previous section, Dr. Klug examined Plaintiff and prepared a consultative examination report (Tr. 518-23). However, Dr. Klug's report did not consider or impose limitations, other than concluding that Plaintiff could not participate in the management of his own funds (Tr. 522).

symptoms involving concentration and persistence, social interaction, and adaptability could be caused by Plaintiff's medically determinable impairments (Tr. 69). However, Dr. Galassi-Hudspeth found that Plaintiff's statements about the intensity, persistence, and functionally limiting effects of his symptoms were not substantiated by the objective medical evidence (Tr. 69). Instead, she believed that Plaintiff's statements regarding his symptoms were partially consistent with his medical records (Tr. 69). In evaluating his limitations, Dr. Galassi-Hudspeth determined that Plaintiff was "moderately limited" in carrying out detailed instructions, maintaining attention and concentration for prolonged periods of time, working in coordination with or in proximity to others, interacting appropriately with the public, and getting along with coworkers or peers (Tr. 70). Conversely, she found that Plaintiff was "not significantly limited" in carrying out very short and simple instructions, performing activities within a schedule and maintaining attendance, sustaining an ordinary routine without special supervision, making simple work related decisions, completing a normal workday and workweek without interruptions or excessive breaks due to his symptoms, asking questions or requesting assistance, accepting instructions and responding appropriately to criticism, and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness (Tr. 70). Dr. Galassi-Hudspeth also indicated that Plaintiff did not have any understanding or memory limitations (Tr. 69).

Ultimately, Dr. Galassi-Hudspeth concluded that Plaintiff could perform unskilled work and "could understand, remember and perform at least simple and routine tasks in the work setting." (Tr. 70). Additionally, "[t]he claimant can negotiate

transportation to get to work environments, follow work guidelines and make decisions appropriate to this level of work activity." (Tr. 70). However, she opined that "[t]he claimant should not deal with the public but can relate to a supervisor and a limited number of fellow employees." And applying those limitations, Dr. Galassi-Hudspeth stated that Plaintiff cannot be considered disabled because there are a significant number of jobs he can still perform that do not require dealing with the public, close supervision, or close cooperation with coworkers (Tr. 71).

At the recon level, Howard Tin, Psy.D, agreed with the limitations imposed by Dr. Galassi-Hudspeth (Tr. 81). Accordingly, Dr. Tin's report mirrored the previous report's conclusion that Plaintiff was not disabled because there are a sufficient number of entry-level jobs that Plaintiff can perform with his limitations, including: (1) reeler (paper goods), drier attendant (garment), and skin lifter, bacon (meat products) (Tr. 83).

III.    *Administrative Hearing*:

An administrative hearing was held before ALJ Onderak on May 31, 2023 (Tr. 35-65). Plaintiff testified that he had been living alone in a house for approximately six years (Tr. 41). He did, however, have six cats and a dog in the house with him (Tr. 41). Plaintiff said he had tried working as a mechanic just three months prior to the hearing, but it didn't work out and he left after two weeks (Tr. 42). Prior to that position, Plaintiff worked for several months in 2019 and again for a shorter period in 2021 at a company that built fiberglass storm shelters and above ground safe rooms (Tr. 42-44). Plaintiff said he can work when his mental health is okay, but he is unable to do so when his mental

health deteriorates (Tr. 44). Plaintiff also indicated he had obtained a driving permit, but his plan to be a truck driver wasn't something he would be able to do for a while (Tr. 45).

When Plaintiff's counsel questioned him about his impairments and ability to work, Plaintiff answered that he is not able to reliably show up to work due to his mental health (Tr. 45-46). He testified that he believed his long list of medications was negatively impacting his memory, energy levels, and concentration (Tr. 46). Plaintiff stated his memory is not very good, which means he must write everything down (Tr. 47). He said he has trouble focusing and gets sidetracked very easily (Tr. 47). He also testified that his house was a wreck, and his hygiene was poor because of his inability to complete chores and tasks (Tr. 47-48).

Plaintiff next said he does not handle stressful situations well and suffers from panic attacks (Tr. 48-49). Moreover, his sleep fluctuates from anywhere between six and twelve hours per night based upon his mental health and mood (Tr. 49). Plaintiff testified that he attends counseling approximately once a month, but he occasionally misses appointments because of how stressful they can be (Tr. 50). He also explained that he doesn't like talking and hates having to retell his story whenever he encounters a new psychiatrist or healthcare worker (Tr. 50). In response to a question from his counsel, Plaintiff said his mood swings often and he is constantly suicidal (Tr. 50-51). Moreover, Plaintiff stated that he has plans to go to Canada for assisted suicide after his mother passes away (Tr. 51).

Plaintiff said that he gets through the day by doing things such as taking care of his animals, trying to learn new things, and thinking of ways to make money (Tr. 51). He

also testified that he wants to be able to work (Tr. 51). Plaintiff found certain things
triggered his mood swings including bad news, the police, and bad weather (Tr. 51).
Plaintiff said he tries to avoid social situations, including grocery shopping, due to his
anxiety and panic attacks (Tr. 51-52). He noted his panic attacks were typically two to five
minutes, but some lasted as long as 45 minutes (Tr. 52). Additionally, while he was being
prescribed medication that helped with his panic attacks, it did not eliminate them (Tr.
52).

Regarding his PTSD, Plaintiff said he frequently has bad dreams about his wife
who died from an overdose, his father who committed suicide, and his best friend who
also died from an overdose (Tr. 53). Plaintiff's counsel questioned him about how he feels
going to the store or dealing with the public, to which he answered that he was constantly
worried in those types of situations (Tr. 54). As a result, Plaintiff tries to get in and out as
fast as possible when he is in a crowd (Tr. 54). Plaintiff testified that he had a history of
drug use but has been doing great in regard to opiates (Tr. 54). However, he admitted to
having used amphetamines a couple times a few months ago to help him get out of
depressed moods (Tr. 54).

Plaintiff stated that he had a great boss at the job he held in 2019 and briefly in
2021, but he ultimately left because it got to the point that he could not handle going in
to work (Tr. 55). At the more recent position he held as a mechanic, he was unable to keep
that position because of personality disagreements (Tr. 55). Plaintiff testified to having an
all-liquid diet because he had no desire to eat or cook and it was healthier and easier to
just consume liquids (Tr. 55-56). He said he was unable to keep up with chores around

his house and his mother typically did his laundry for him (Tr. 56). Plaintiff also noted

that he used to have a social life, shower regularly, and do his hair, but now he barely did

any of those things (Tr. 57). However, Plaintiff was still able to ensure his animals had

water, food, and a clean litter box (Tr. 57). And when questioned about his hobbies,

Plaintiff said he liked working on small engines, tinkering on things to help his mom,

watching YouTube videos to learn new things, and occasionally watching

documentaries, educational videos, and stand-up comedy (Tr. 57-58). Plaintiff concluded

his testimony by discussing the tragic events that occurred in his past including his wife's

overdose, father's suicide, and friend's overdose, and his struggle to keep going (Tr. 59-

60).

Vocational Expert Leida Woodham also testified at the hearing (Tr. 60-63). The ALJ

first asked Ms. Woodham to classify Plaintiff's prior job building fiberglass storm shelters

(Tr. 61). Ms. Woodham stated the Dictionary of Occupational Titles (DOT) classification

for that job would be an assembler, subassembly (Tr. 61). The ALJ then posed the

following hypothetical to Ms. Woodham:

> I want you to assume a hypothetical individual of the Claimant's
> same age, education, and work history. Further assume the following. This
> individual has no exertional limitations. He can learn and engage in rote
> tasks that are simple, routine, and repetitive, and he must work in a stable
> setting where there is no more than occasional change in terms of tools
> used, the processes employed, or the setting itself.
>
> The individual should not engage in work-related interactions with
> the general public, and he can occasionally engage in work-related
> interactions with coworkers. With those limitations, could the individual
> perform the assembler job?

(Tr. 61-62). Ms. Woodham answered that the hypothetical individual could not perform Plaintiff's prior position as an assembler (Tr. 62). The ALJ then asked Ms. Woodham if there were any jobs that the hypothetical individual could perform (Tr. 62). Ms. Woodham answered that there were, including: (1) stores laborer – DOT 922.687-058; (2) salvage laborer – DOT 929.687-022; and (3) kitchen helper – DOT 318.687-010 (Tr. 62). Ms. Woodham testified that her classifications were consistent with the DOT, but her opinion regarding the limitations of no contact with the public and occasional contact with coworkers came from her experience as a vocational counselor (Tr. 62).

Thereafter, Plaintiff's counsel asked Ms. Woodham if any work was still available if the hypothetical individual was off task more than 10 percent of the time (Tr. 63). Ms. Woodham answered no, explaining that unskilled workers are required to be on task 90 percent of the time (Tr. 63). Similarly, when asked about work availability if the individual frequently loses focus or concentration, Ms. Woodham reiterated that work would not be available if the individual could not stay on task 90 percent of the time (Tr. 63). Additionally, Ms. Woodham indicated that no work would be available if the individual was absent more than once per month (Tr. 63).

## THE ALJ'S DECISION

The ALJ followed the five-step analytical framework described above. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since November 6, 2021, Plaintiff's application date (Tr. 19). At step two, the ALJ found Plaintiff had the severe impairments of attention deficit hyperactivity disorder (ADHD), major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder (PTSD),

schizoaffective disorder, and a history of opiate and methamphetamine addiction (Tr. 19-
20). At step three, the ALJ determined that Plaintiff does not have an impairment or
combination of impairments that meets or medically equals the severity of one of the
listed impairments in 20 CFR 404, Subpart P, Appendix 1 (Tr. 20-21). In making this
determination, the ALJ considered the severity of Plaintiff's mental impairments and
found he has moderate limitations in: (1) understanding, remembering, or applying
information; (2) interacting with others; (3) concentrating, persisting or maintaining pace;
and (4) adapting or managing oneself (Tr. 20-21).

Prior to considering step four, the ALJ analyzed Plaintiff's RFC (Tr. 22-28). The
ALJ found as follows:

> After careful consideration of the entire record, the undersigned finds that
> the claimant has the residual functional capacity to perform a full range of
> work at all exertional levels but with the following nonexertional
> limitations: the claimant can learn and engage in rote tasks that are simple,
> routine, and repetitive. He must work in a stable setting where there is no
> more than occasional change in terms of tools used, the processes
> employed, or the setting itself. He should not engage in work-related
> interactions with the general public and he can occasionally engage in
> work-related interactions with coworkers.

(Tr. 22). In reaching this conclusion, the ALJ found that Plaintiff's medically determinable
impairments could reasonable be expected to cause his symptoms, but his statements
concerning intensity, persistence, and limiting effects were not entirely consistent with
the record (Tr. 24). "The objective evidence concerning the claimant's mental
impairments is consistent with work limitations but not complete debilitation." (Tr. 26).

The ALJ referenced numerous pieces of evidence to support his conclusion and
RFC determination. First, the ALJ recounted Plaintiff's hearing testimony, including both

his statements regarding his mental health and his statements related to his daily
activities (Tr. 22-24). The ALJ then discussed some of Plaintiff's medical history including
his visits with Dr. Newcomb and his admission to Mulberry in June 2022 (Tr. 25). The
ALJ noted that Plaintiff's increased symptoms and admission to Mulberry were
considered acute and precipitated by a lack of effective medication and increased social
stressors (Tr. 26). The ALJ pointed out that Plaintiff regularly cares for multiple pets and
assists his mother with household chores, along with occasionally performing tasks such
as roofing, putting up siding, repairing lawnmowers and weed eaters, and laying sewer
line (Tr. 26). The ALJ emphasized that even when Plaintiff's symptoms were at their
worst, he was able to finalize the deed to his home, help others, garden, and attempted
to get his drivers license back (Tr. 27). Consequently, the ALJ held that Plaintiff "has
consistently shown that he is capable of completing at least simple, routine, and rote tasks
in a stable environment." (Tr. 26). The ALJ further reasoned that "[t]here is no evidence
of any issues getting along with authority figures save for recent conflict over not getting
paid enough (understandable gripe with the low paying job)." (Tr. 27). And significantly,
the ALJ explained that Plaintiff's testimony as to the severity of his symptoms was not
consistent with his daily activities or his statements to medical providers (Tr. 27).

The ALJ next reviewed the findings of the state agency's psychological
consultants, Dr. Galassi-Hudspeth and Dr. Tin (Tr. 27). The ALJ found their opinions
mostly persuasive, stating that they were supported by the totality of the evidence (Tr.
27-28). However, "[t]heir findings cannot be wholly persuasive because the State agency's
consultants do not define what 'limited number' means when referencing his ability to

interact with a limited number of fellow employees. Without defining this term, it leaves

too much vagueness for interpretation and so cannot be credited." (Tr. 28). Accordingly,

the ALJ found it more appropriate to limit Plaintiff in vocationally specific terms such as

no public interaction and only occasional work-related interactions with coworkers (Tr.

28). Additionally, the ALJ found Dr. Klug's report to be of no persuasive value because

Dr. Klug did not offer any opinions on Plaintiff's functioning other than one unexplained

opinion that he could not manage his own funds (Tr. 28).

At step four, the ALJ relied upon the Vocational Expert's testimony to conclude

that Plaintiff is unable to return to any past relevant work (Tr. 28-29). Finally, at step five,

the ALJ again relied on the testimony of the Vocational Expert to conclude that Plaintiff

was not disabled because there are jobs that he is able to perform which exist in significant

numbers in the national economy including store laborer, salvage laborer, and kitchen

helper (Tr. 29-30). The ALJ also found the Vocational Expert's testimony about other jobs

to be consistent with the DOT (Tr. 30).

### <u>ISSUES RAISED BY PLAINTIFF</u>

Plaintiff raises the following issues:

1. The ALJ did not build a logical bridge between the evidence and Plaintiff's
   RFC, and any cited evidence was cherry-picked.

### <u>DISCUSSION</u>

Plaintiff raises several arguments challenging the ALJ's determination of his RFC

(Doc. 13 at pp. 8-13). First, Plaintiff claims the ALJ failed to build a logical bridge to

support the conclusion that Plaintiff could have occasional interaction with coworkers

and unlimited interaction with supervisors (*Id.* at p. 10). Second, Plaintiff claims the ALJ failed to adequately consider his reduced concentration when formulating Plaintiff's RFC and concluding that other jobs are available (*Id.*). Finally, Plaintiff argues that to the extent the ALJ considered and addressed any evidence related to Plaintiff's ability to interact with others and/or concentrate, the ALJ improperly cherry-picked evidence that supported his conclusion while failing to consider adverse evidence (*Id.* at pp. 10-13). Ultimately, because Plaintiff's concentration argument is dispositive, the Court's analysis focuses upon that point.

RFC is an assessment of what work-related activities an individual can perform despite his or her limitations. *Young v. Barnhart*, 362 F.3d 995, 1000–01 (7th Cir. 2004) (citing 20 C.F.R. § 404.1545(a)). An individual's RFC should be assessed based upon all relevant evidence in the record. *Id.* However, the Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). In other words, an ALJ may not simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a contrary result. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). "But an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion." *Id.*

Here, the Court finds the ALJ's mental RFC determination and related conclusion that jobs are available to Plaintiff to be erroneous because the ALJ did not build a logical bridge from the evidence to his conclusion. Pertinently, the ALJ accepted the findings of

Dr. Galassi-Hudspeth and Dr. Tin as they relate to concentration limits without acknowledging a critical portion of those reports and posing those limitations to the Vocational Expert. Specifically, both doctors' reports found Plaintiff had sustained concentration and persistence limitations and then specifically concluded that Plaintiff was "moderately limited" in his ability to: (1) carry out detailed instructions, (2) maintain attention and concentration for extended periods, (3) work in coordination with or in proximity to others without being distracted by them (Tr. 70, 81). Moreover, the ALJ also determined at step three that Plaintiff has a moderate limitation "with regard to concentrating, persisting or maintaining pace." (Tr. 21). Nevertheless, the ALJ's hypothetical posed to the Vocational Expert did not contain an explicit concentration limitation. Instead, the hypothetical posed to the Vocational Expert stated "[h]e can learn and engage in rote tasks that are simple, routine, and repetitive, and he must work in a stable setting where there is no more than occasional change in terms of tools used, the processes employed, or the setting itself." (Tr. 61-62).

On its face, the limitation to rote tasks posed in the ALJ's hypothetical, and further explained in the ALJ's decision (*see* Tr. 21, 24, 26, 28), may appear to adequately account for Plaintiff's concentration issues. In fact, both Dr. Galassi-Hudspeth and Dr. Tin concluded that Plaintiff "can focus on simple and routine work tasks," further supporting this argument (Tr. 70, 81). The issue, however, is that by providing a hypothetical to the Vocational Expert that merely limited the individual to rote tasks *without also including or mentioning moderate concentration limits* like those found in the doctors' reports, which the

ALJ credited[5] (*see* Tr. 28), "does nothing to ensure that the VE eliminated from her responses those positions that would prove too difficult for someone with [Plaintiff's mental] disorder[s]." *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014). In other words, the Vocational Expert's conclusion that the hypothetical individual (i.e., Plaintiff) could work certain jobs was made without the Vocational Expert also considering that the individual had a moderate limitation in concentrating, persisting or maintaining pace.

The Seventh Circuit has "repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Yurt v. Colvin*, 758 F.3d 850, 858-59 (7th Cir. 2014); *see also Mischler v. Berryhill*, 766 F. App'x 369, 376 (7th Cir. 2019); *DeCamp v. Berryhill*, 916 F.3d 671, 675 (7th Cir. 2019); *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015); *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008); *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004). This is because, "[a] task can be simple [or rote], but a person with a poor attention span may still become distracted and stop working." *Mischler*, 766 F. App'x at 376. Consequently, "the vocational expert did not address these [concentration] limitations when [she] suggested vocations" such as stores laborer, salvage laborer, and kitchen helper. *Stewart*, 561 F.3d at 685. "In light of this clear line of precedent, both the ALJ's hypothetical and the Commissioner's subsequent defense of

---

[5] Notably, the ALJ found Dr. Galassi-Hudspeth and Dr. Tin's limiting Plaintiff to interacting with "a limited number of fellow employees" to be unpersuasive because it did not define that term (Tr. 28). However, the ALJ found their reports to be persuasive in all other regards, which the Court takes to mean that he found their reports to be persuasive as it relates to Plaintiff's concentration limits.

that hypothetical lack substantial justification." *Id.*

For example, in *Mischler*, the ALJ posed a hypothetical that limited the claimant to "(1) 'simple routine and repetitive tasks' in a low-stress job, defined as one involving only occasional (2) decision-making, (3) changes in the work setting, (4) and interaction with the public or co-workers; (5) 'no piecework or fast moving assembly line type work;' and (6) the flexibility to be off-task up to ten percent of the day." *Id.* at 375-76. The Seventh Circuit found this hypothetical to be deficient because it failed to account for the moderate difficulties in concentration, persistence, and pace that were identified in the state agency's psychological consultant's opinion and adopted by the ALJ. *Id.* at 376. Additionally, the Seventh Circuit rejected the Commissioner's argument that the RFC was appropriate because it adopted the psychological consultant's bottom-line opinion that the claimant could work on a "sustained basis" *Id.* The *Mischler* Court held that the bottom-line opinion failed to account for the concentration limits that the psychological consultant had previously identified, and thus, "the ALJ was required to account for them himself—in the hypothetical and RFC." *Id.* at 376-77.

Here, as in *Mischler*, both the state agency consultants and the ALJ found Plaintiff had moderate limitations in concentrating, persisting or maintaining pace. Therefore, the ALJ should have either included those concentration limitations in his hypothetical to the Vocational Expert, or alternatively, rejected such conclusions/evidence and explained why he did not find them to be persuasive. *See id.* By failing to do either, the Vocational Expert did not fully consider all of Plaintiff's impairments, including those in concentration, when determining whether Plaintiff could work other jobs. *See DeCamp*,

916 F.3d 671, 676 (7th Cir. 2019) ("Here, the ALJ similarly focused her analysis on the doctors' bottom-line conclusion that DeCamp was not precluded from working without giving the vocational expert any basis to evaluate all DeCamp's impairments, including those in concentration, persistence, and pace.").[6]

Moreover, Plaintiff's counsel asked the Vocational Expert about the implications of focus and concentration limitations during the hearing (Tr. 63). Specifically, the following exchange occurred:

> Plaintiff's Counsel:  Okay. And just, lastly, in terms of focus and concentration, if the individual is frequently losing focus and concentration during the workday, would that have a bearing on the availability of work?

> Vocational Expert:  The worker must be on task 90 percent of the time. If that is not accomplished, there would be no work.

(Tr. 63). Considering the Vocational Expert's admission as to the implications of concentration limits and clear Seventh Circuit precedent, the Court finds the ALJ erred by never posing concentration limitations to the Vocational Expert, particularly in light of the ALJ's determination that Plaintiff had a moderate limitation in concentrating (*see*

---

[6] Additionally, the Commissioner argues that the ALJ's mental RFC determination regarding Plaintiff's concentration limits was supported by evidence of Plaintiff's ability to care for his pets, help with chores, and perform minor contracting and repair work (Doc. 19 at pp. 4-5). However, the Seventh Circuit has cautioned against this type of reasoning, stating "we repeatedly have cautioned against conflating a claimant's ability to perform household activities with an ability to work full-time. Further, as [claimant] testified, she does not keep up her home wholly on her own; rather, her two children assist with chores—a fact that the ALJ did not address." *Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019). Likewise, here the ALJ relied upon Plaintiff's daily activities to support a finding that Plaintiff was capable of at least rote, simple work without public interaction. Specifically, the ALJ found Plaintiff "is able to concentrate on a variety of tasks, as demonstrated by his activities of daily living." (Tr. 28). To put it simply, the Court questions whether having the focus to feed pets, garden or work on lawnmower repairs at Plaintiff's own pace demonstrates an ability to concentrate and focus for an entire workday in an external setting – particularly in light of the reminders and assistance Plaintiff purportedly receives from his mother (*see, e.g.*, Tr. 210-217).

Tr. 21). For these reasons, the Commissioner's final decision denying Plaintiff's application for SSI is REVERSED and REMANDED.

As a final note, the Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes Plaintiff was disabled or that he should be awarded benefits. To the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

### CONCLUSION

The Commissioner's final decision denying Plaintiff's applications for SSI is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:** November 7, 2024

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**